# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: December 27, 2023

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
E. M.,                              *        No. 14-753V
                                    *
            Petitioner,             *        Special Master Sanders
                                    *
v.                                  *
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
            Respondent.             *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Scott B. Taylor*, Urban & Taylor, S.C., Milwaukee, WI, for Petitioner.
*Voris E. Johnson*, United States Department of Justice, Washington, DC, for Respondent.

## RULING ON PETITIONER'S LOST EARNINGS CLAIM[1]

On August 19, 2014, E.M.  ("Petitioner")[2] filed a petition for compensation pursuant to the National Vaccine Injury Compensation Program.[3]  Pet. at 1, ECF No. 1; 42 U.S.C. §§ 300aa-1 to -34 (2012). Petitioner alleged that the influenza ("flu") vaccine she received on August 23, 2011,

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Order will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] On July 22, 2021, Petitioner filed a motion to redact her name, her mother's identity, and information regarding her employer from my Ruling on Entitlement. ECF No. 95 at 1; ECF No. 96. On August 6, 2021, I granted Petitioner's motion and directed the Clerk of Court to change the case caption. Order, ECF No. 102. Accordingly, I will continue to refer to Petitioner by her initials and redact information regarding her employer. Petitioner's mother is not identified in this Order.

[3] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

caused her to suffer from small fiber neuropathy ("SFN")[4] and small vessel vasculitis.[5] Pet. at 1; *see also* Pet'r's Pre-Hr'g Br. at 1, ECF No. 70.

On July 9, 2021, I issued a Ruling on Entitlement, finding that Petitioner presented preponderant evidence that the flu vaccine she received on August 23, 2011, was the cause-in-fact of her small fiber neuropathy. Ruling on Entitlement ("Ruling"), ECF No. 94. The parties have been unable to resolve the amount of compensation Petitioner should be awarded, and Respondent filed a motion to dismiss Petitioner's lost earning claim on October 31, 2022. Resp't's Mot., ECF No. 127. The parties have since filed additional evidence and briefings in support of their respective positions. In his accompanying brief, Respondent stated that "[o]nce the issue of lost earnings is decided, . . .the parties can resolve pain and suffering informally." Resp't's Br., ECF No. 128 at 2 n.2. I did not order, and neither party has submitted, evidence or arguments for a specific pain and suffering award. I will make no such determination at this time. For the reasons set forth below, I find that Petitioner has not presented preponderant evidence that she is entitled to an award for future wage loss.

## I.   PROCEDURAL HISTORY

I recounted the complete procedural history of the case in my July 9, 2021 Entitlement Decision. *See* Ruling at 2–4. A summary of events that occurred prior to the entitlement determination is provided here, followed by a more extensive account of the damages phase.

Petitioner filed her petition for compensation on August 19, 2014, along with supporting documents. Pet. at 1; Pet'r's Exs. 1–9, ECF No. 1. On September 16, 2014, the parties appeared for a status conference, and the presiding special master ordered Petitioner to file an affidavit regarding damages. *See* Min. Entry, docketed Sept. 16, 2014; Sched. Order, ECF No. 8. Petitioner filed her first affidavit regarding damages on October 16, 2014. Pet'r's Ex. 11, ECF No. 9-1.

Respondent filed his Rule 4(c) report on November 14, 2014, recommending that compensation be denied. Resp't's Report, ECF No. 10. The case was subsequently referred to alternative dispute resolution ("ADR"). Order, ECF No. 12. The parties were unable to come to an agreement, and the case was removed from ADR on April 16, 2015. Order, ECF No. 15.

Petitioner filed an expert report from Dr. David S. Younger on July 7, 2015, along with supporting medical literature and a supplemental affidavit authored by Petitioner. Pet'r's Exs. 14–20, ECF No. 25. Respondent filed his responsive expert report from Dr. Peter D. Donofrio on October 16, 2015, along with supporting medical literature. Resp't's Exs. A–H, ECF No. 29.

---

[4] Small fiber neuropathy is "a type of neuropathy in which only the small sensory cutaneous nerves are affected." *Dorland's Illustrated Medical Dictionary* 1252 (33rd ed. 2020) [hereinafter "*Dorland's*"]. Neuropathy is "a functional disturbance or pathologic change in the peripheral nervous system, sometimes limited to noninflammatory lesions as opposed to those of neuritis; the etiology may be known or unknown." *Id.* at 1251.

[5] Small vessel vasculitis is "any of a group of vascular diseases of the small vessels, including microscopic polyangiitis, Wegener granulomatosis, Churg-Strauss syndrome, and pauci-immune crescentic glomerulonephritis." *Dorland's* at 1996. Vasculitis is "inflammation of a blood or lymph vessel." *Id.*

On May 13, 2016, the presiding special master scheduled this matter for an entitlement hearing to take place on January 12-13, 2017. Sched. Order, ECF No. 47. However, on September 2, 2016, Petitioner filed a motion for relief to name a new expert neurologist, file new expert reports, and to adjourn the upcoming entitlement hearing in this matter. ECF No. 54. The presiding special master granted Petitioner's motion and postponed the entitlement hearing "indefinitely." Order, ECF No. 56. The presiding special master ordered Petitioner to submit a status report on the progress of obtaining a new expert. *Id.*

On January 31, 2017, Petitioner filed an expert report from Dr. Lawrence Steinman along with thirty-one pieces of medical literature. Pet'r's Exs. 41–72, ECF No. 60; Pet'r's Ex. 40, ECF No. 77-1. Respondent filed his responsive supplemental expert report from Dr. Donofrio along with supporting medical literature on April 20, 2017. Resp't's Exs. L–M, ECF No. 63.

This case was reassigned to me on October 10, 2017. ECF No. 65. This matter was subsequently set for an entitlement hearing that was held on July 18–19, 2019. ECF No. 68; *see* Notice, ECF No. 80. Following the entitlement hearing, Petitioner filed a supplemental expert report and medical literature on October 14, 2019. Pet'r's Exs. 78–83, ECF No. 85. The same day, Petitioner filed her opening post-hearing brief. Pet'r's Post-Hr'g Br., ECF No. 86. On November 15, 2019, Respondent filed his responsive supplemental expert report along with his post-hearing response brief. Resp't's Ex. N, ECF No. 88; Resp't's Post-Hr'g Br., ECF No. 89. Petitioner submitted a rebuttal expert report and a post-hearing rely brief on January 6, 2020. Pet'r's Ex. 84, ECF No. 91-1; Pet'r's Post-Hr'g Reply, ECF No. 92. I issued my Ruling on July 9, 2021. *See* ECF No. 93.

This case entered the damages phase on August 20, 2021. Damages Order, ECF No. 105. Petitioner issued subpoenas to medical providers for updated medical records and filed additional records on December 6, 2021. Pet'r's Ex. 88, ECF No. 112-1; *see* ECF Nos. 110–111. Petitioner filed two damages expert reports, along with curriculum vitae ("CV"), and medical literature on April 25, 2022. Pet'r's Exs. 89–98, ECF No. 117. She filed a supplemental expert report and additional supporting literature and documentation on May 25, 2022. Pet'r's Exs. 99–108, ECF No. 118; Pet'r's Exs. 109–118, ECF No. 119; Pet'r's Exs. 119–123, ECF No. 120.

In response, Respondent filed two expert reports, corresponding CVs, and a motion to dismiss Petitioner's lost earning's claim with a supporting memorandum. Resp't's Exs.O–R, ECF No. 126; Resp't's Mot.; Resp't's Br. Respondent filed medical literature on November 2, 2022. Resp't's Exs. O, Tabs 1–3, ECF No. 129; Resp't's Exs. Q, Tabs 1–5, ECF No. 130. Petitioner responded to Respondent's motion on November 28, 2022, and submitted a supplemental expert report and supporting documents. Pet'r's Resp., ECF No. 132; Pet'r's Exs. 124–135, ECF No. 133; Pet'r's Exs. 136–37, ECF No. 134. Respondent filed a reply on December 5, 2022. Resp't's Reply, ECF No. 135. On December 12, 2022, I referred this case to ADR. Order, ECF No. 136. Petitioner filed an additional expert report on January 30, 2023, the expert's CV, and supporting documents. Pet'r's Exs. 138–150, ECF No. 137. The parties reached an impasse in ADR, and ADR proceedings concluded on April 6, 2023. Order. ECF No. 138.

On August 7, 2023, and September 15, 2023, Petitioner filed a supplemental brief, updated medical records, affidavits, medical literature, and other documents in support of her lost wages

claim. Pet'r's Supp. Br., ECF No. 145; Pet'r's Exs. 151–162, ECF No. 146; Pet'r's Exs. 163–67, ECF No. 148.Respondent responded with a supplemental expert report, literature, and a memorandum. Resp't's Exs. S–U, ECF No. 149; Resp't's Supp. Br., ECF No. 150.  Petitioner filed a motion on October 17, 2023, requesting an opportunity to file additional evidence. ECF No. 151. In light of the age of this case and the extensive pleadings and filings, particularly as it relates to damages, there is no need for further evidence or arguments. This Order renders Petitioner's motion moot. Respondent's motion to dismiss Petitioner's future wage loss claim is ripe for adjudication.

## II.    FACTUAL HISTORY

### A.  Medical Records

A detailed account of the medical records filed during the entitlement stage of this case was provided in my July 2021 Decision. They will be briefly recounted here followed by a summary of the records filed during the damages litigation.

#### i.  Entitlement Stage Medical Evidence

Petitioner's pre-vaccination medical history is significant for Von Willebrand's disease,[6] dysmenorrhea,[7] asthma, eosinophilic esophagitis,[8] and migraine headaches. *See* Pet'r's Ex. 1 at 24–25, ECF No. 1-2. Petitioner's migraines began after she sustained a concussion in 2003. Pet'r's Ex. 2 at 49–62, ECF No. 1-3. In June 2010, Petitioner presented to neurologist Traci Purath, M.D., at the Comprehensive Headache Center to establish care and for treatment of occipital neuralgia[9] with underlying migraines. *Id.*

On August 23, 2011, Petitioner received the flu vaccine during her yearly physical exam with her primary care physician ("PCP"). Pet'r's Ex. 1 at 27. At the time of vaccination, Petitioner was twenty-four years old. Pet. at 1.

Two days later, on August 25, 2011, Petitioner presented to Dr. Purath. Pet'r's Ex. 2 at 46. During this visit, Petitioner reported "that her headaches had been under great control until [two] weeks ago." *Id.* Dr. Purath noted that Petitioner indicated at that time, she "awoke with a severe headache, and had this sporadic tingling in her face." *Id.* Petitioner stated this had been going on and off for the past two weeks, but "there was no inciting event, no trauma, no medication changes[.]" *Id.* However, Dr. Purath noted that the only change was that Petitioner had recently finished law school and was back at home with her parents. *Id.* Dr. Purath opined that "much of

---

[6] Von Willebrand's disease is "a congenital bleeding disorder caused by mutation in the *VWF* gene [ ], resulting in deficiency of von Willebrand factor, with prolonged bleeding time and often impairment of adhesion of platelets on glass beads, associated with epistaxis and increased bleeding after trauma or surgery, menorrhagia, and postpartum bleeding." *Dorland's* at 538.

[7] Dysmenorrhea is "painful menstruation." *Dorland's* at 572.

[8] Eosinophilic esophagitis is "inflammation caused by eosinophilic infiltration of the esophageal mucosa; the etiology is unknown, although it sometimes accompanies gastroesophageal reflux disease and sometimes may be an allergic reaction." *Dorland's* at 640.

[9] Occipital neuralgia, or occipital headache, is "pain in the distribution of the occipital nerves, due to pressure or trauma to the nerve." *Dorland's* at 1244.

this may be just what we call the letdown headache where your body actually can start to rest." *Id.* Nonetheless, Dr. Purath noted that Petitioner stated "she has been having tingling in the left side of her face, both sides of her face, and into her hands. She feels that she feels off." *Id.*

The next day, on August 26, 2011, Petitioner returned to Dr. Purath. *Id.* at 43. Upon further questioning regarding Petitioner's condition, Petitioner reported that "the dysesthesias[10] all started after Tuesday night [August 23, 2011] after she had a flu shot." *Id.* Dr. Purath noted Petitioner maintained "[t]hey did not occur before this." *Id.* Dr. Purath further indicated "[t]hey progressed to the point that today, Friday[,] August 26, 2011, she complain[ed] of complete numbness of the left face, dysesthesias in the left arm, swelling in the left leg, with weakness in the left hand." *Id.* Petitioner reported that the symptoms became progressively worse. *Id.* Dr. Purath wrote she was "concerned that this may all be related to the flu shot." *Id.* However, Dr. Purath noted she "d[id] not feel that [Petitioner] has encephalitis[11] symptoms but transverse myelitis[12] may be a possibility given the issues with the left side of the body." *Id.* Upon examination, Dr. Purath noted decreased sensation to pinprick in Petitioner's left arm and increased deep tendon reflexes ("DTRs")[13] in her left upper and lower extremities. *Id.*

On September 1, 2011, Petitioner returned to Dr. Purath with complaints of shooting back pain radiating down to the bilateral buttocks. *Id.* at 37. Dr. Purath reiterated that the results of Petitioner's electroencephalogram test ("EEG") conducted on August 25, 2011, were normal. *Id.* She also noted that Petitioner's dysesthesias and tingling "[we]re much improved." *Id.* Yet, "[i]t d[id] still have various locations, but it [wa]s overall not as severe or bilateral as it had been." *Id.* Dr. Purath again noted that "[a]ll these issues stem from having the flu shot . . . and this [wa]s certainly not a migraine." *Id.* On September 16, 2011, Petitioner returned to Dr. Purath and reported an increase in numbness on the right side of her face and in her right upper and lower extremities. *Id.* at 34. Following this appointment, Dr. Purath wrote that she "still believe[d] that [Petitioner] has had a reaction to the flu shot, which [she] fe[lt wa]s slowly improving." *Id.*

During Petitioner's follow up visit with Dr. Purath on October 28, 2011, Dr. Purath noted Petitioner's lower back pain had completely resolved. *Id.* at 29. However, Petitioner reported having blurred vision in her right eye,[14] bilateral hand tremors, and numbness in various locations in her arms, legs, and face. *Id.* She again wrote her opinion that Petitioner's symptoms started after the flu injection. *Id.* However, Dr. Purath did not "find anything that [wa]s jumping out at [her]

---

[10] Dysesthesias are "1. distortion of any sense, especially of that of touch . . . 2. an unpleasant abnormal sensation produced by normal stimuli." *Dorland's* at 570.

[11] Encephalitis is "inflammation of the brain." *Dorland's* at 605.

[12] Transverse myelitis is "myelitis in which the functional effect of the lesions spans the width of the entire cord at a given level." *Dorland's* at 1201. Myelitis is inflammation of the spinal cord or the bone marrow. *Id.*

[13] Deep tendon reflexes ("DTRs") are "involuntary contraction[s] of a muscle after brief stretching caused by percussion of its tendon; tendon reflexes include the biceps reflex, triceps reflex, quadriceps reflex, and others." *Dorland's* at 1590.

[14] On October 28, 2011, Petitioner presented to ophthalmologist John Conto, O.D., for an examination. Pet'r's Ex. 3.1 at 13–23, ECF No. 1-4. Petitioner reported a change in her vision within the previous two weeks. *Id.* at 19. Dr. Conto noted that his impression was that Petitioner experienced "sudden vision loss[.]" *Id.* at 20. However, the rest of Dr. Conto's notes are illegible and difficult to decipher. *See id.*

neurologically as a deficit[,]" so she referred Petitioner to another neurologist for further evaluation. *Id.*

On November 4, 2011, Petitioner presented to neurologist Jorge Marquez de Leon, M.D., for a second opinion. Pet'r's Ex. 4.2 at 535–43, ECF No. 1-11. Upon examination, Dr. Marquez de Leon opined that Petitioner's paresthesia[15] and limb pain were "most likely secondary to a small fiber neuropathy." *Id.* at 542. He further noted that "[t]he possibility of a reaction to her vaccination appears to be the most likely etiology." *Id.* Dr. Marquez de Leon ordered Petitioner to undergo additional laboratory tests and an autonomic evaluation.[16] *Id.* As a result, Dr. Marquez de Leon concluded that there were "changes indicative of mild autonomic neuropathy,[17] which is affecting both the sudomotor and vasomotor sympathetic pathways.[18] Pet'r's Ex. 9 at 47, ECF No. 1-18.

On April 12, 2012, Petitioner presented to the emergency room with complaints of chest pain and shortness of breath. Pet'r's Ex. 4.3 at 603, ECF No. 1-12. Petitioner described her chest pain as "heavy" and stated that "[t]he pain d[id] not radiate[]" but was "aggravated by deep breathing." *Id.* Petitioner's past medical history noted small fiber neuropathy, migraines, and "vaccine reaction with vague neurologic symptoms since August." *Id.* Petitioner was discharged home and diagnosed with elevated white blood cells ("WBC") and chest pain. *Id.* at 610.

On April 24, 2012, Petitioner again presented to the emergency room for an abrupt onset of shortness of breath, fever, chest pain, headache, neck pain, and blurred vision. Pet'r's Ex. 4.4 at 714, ECF No. 1-13. Petitioner's main complaint was chest discomfort and she again stated it "[f]e[lt] like someone [wa]s sitting on her chest." *Id.* Petitioner underwent a full work-up, which was unrevealing except for another elevated WBC. *Id.* A chest x-ray, electrocardiogram[19] ("ECG"), and ventilation-perfusion scan[20] ("VQ") were negative. *Id.* at 717. Petitioner was discharged home. *Id.*

---

[15] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorlands* at 1362.

[16] Autonomic testing is "testing for effective functioning of the autonomic nervous system and autonomic reflexes." *Dorland's* at 1874. The autonomic nervous system is "the portion of the nervous system concerned with regulation of the activity of cardiac muscle, smooth muscle, and glandular epithelium; usually restricted to the two visceral efferent peripheral components, the sympathetic nervous system, and the parasympathetic nervous system." *Id.* at 1829.

[17] Autonomic neuropathy is "any neuropathy of the autonomic nervous system, causing symptoms such as orthostatic hypotension, disordered bowel, bladder, or sexual functions, or abnormal pupillary reflexes." *Dorland's* at 1251.

[18] The sudomotor sympathetic pathway relates to "stimulating the sweat glands." *See Dorland's* at 1766. The vasomotor sympathetic pathway refers to "the caliber of a vessel, especially of a blood vessel." *See id.* at 1997.

[19] An electrocardiogram is "a graphic tracing of the variations in electrical potential caused by the excitation of the heart muscle and detected at the body surface." *Dorland's* at 593.

[20] A ventilation-perfusion scan is "a scintigraphic technique for demonstrating perfusion defects in normally ventilated areas of the lung in the diagnosis of pulmonary embolism, consisting of the imaging of the distribution of an inhaled radionuclide followed by the imaging of the perfusion of the lungs by an injected radionuclide." *Dorland's* at 1646.

On May 21, 2012, Petitioner presented for a follow-up with Dr. Marquez de Leon. Pet'r's Ex. 7 at 18, ECF No. 1-16. Petitioner reported that she continued to have a tingling sensation in both arms and legs but that it "[was] somewhat different from what it was six months ago." *Id.* at 19. Petitioner complained that "[i]t [was] more a sensation of coldness and numbness" which now only affected her right side; the "symptoms over the left side [were] almost not there." *Id.* Petitioner underwent a physical examination, which was normal. *Id.* Dr. Marquez de Leon did not prescribe any new medications during this visit. *Id.* at 20.

On June 8, 2012, Petitioner presented to pulmonologist Dr. Rade Tomic, M.D., with complaints of "shortness of breath and chest pains." Pet'r's Ex. 3.2 at 58, ECF No. 1-5. Petitioner described her chest pain as "very strong in intensity and lasts a few seconds, and it subsides by itself." *Id.* A full workup was normal except for an abnormal ANCA result. *Id.* at 59. The extensive workup revealed no indication of pulmonary[21] disease. *Id.* Dr. Tomic suggested a repeat test in three months. *Id.* Later that month, on June 22, 2012, Petitioner presented to Dr. Eric Martin, M.D., a gastroenterologist. *Id.* at 73. Petitioner underwent an esophagram,[22] which was normal. *Id.* at 82. Dr. Martin concluded that, because all other tests were normal, the "source of [Petitioner's] chest pain [wa]s likely secondary to [Petitioner's] small fiber neuropathy." *Id.* at 83.

Petitioner presented for her yearly physical with her PCP on August 29, 2012. Pet'r's Ex. 1 at 8. Petitioner complained of daily chest discomfort. *Id.* Petitioner also reported she experienced "[b]urning of [her] bilateral arms and legs occasionally and most noticeabl[y] in the mornings when getting out of bed." *Id.* at 11. However, Petitioner's physical examination revealed normal results. *Id.*

On September 4, 2012, Petitioner returned to Dr. Purath for a follow-up. Pet'r's Ex. 2 at 8. During this visit, Petitioner reported that her headaches were improving but that she was experiencing increased numbness and weakness in her extremities. *Id.* Petitioner further reported that she has been getting fatigued very easily. *Id.* On September 17, 2012, Petitioner returned to Dr. Marquez de Leon and reported having fatigue, chest pressure, and paresthesia of her arms and face. *Id.* at 15. Dr. Marquez de Leon conducted a physical examination, which yielded normal results. *Id.* at 16. He assessed Petitioner with small fiber neuropathy with both somatic and autonomic features. *Id.* at 17.

On February 6, 2014, Petitioner presented to a new neurologist, Dr. Alexandru C. Barboi, M.D., to establish care. Pet'r's Ex. 9 at 9, ECF No. 1-18. Dr. Barboi's impression was that Petitioner's "history would fit a small fiber neuropathy diagnosis but [her] physical examination d[id] not aid in the localization given the inconsistent nature of [her] sensory exam and non-dermatomal distribution." *Id.* at 13. Dr. Barboi indicated that Petitioner's "[m]ild hypermobility and [right] sided weakness [is] likely congenital." *Id.* Dr. Barboi also noted that "it is possible that [Petitioner] ha[d] some symptoms before her vaccination but this got worse after." *Id.* Dr. Barboi instructed Petitioner to follow-up in six weeks. *Id.*

Petitioner returned to Dr. Barboi for a follow-up on April 10, 2014. *Id.* at 224. During this visit, Petitioner reported that she no longer had pain in her right leg but did still suffer from bilateral

---

[21] Pulmonary is "pertaining to the lungs." *Dorland's* 1529.

[22] An esophagram is "a radiograph of the esophagus." *Dorland's* at 648.

wrist pain in the morning and shaking/pain in her hands when she got excited. *Id.* Petitioner also complained that she experienced pain in her feet at night that she treated with ice packs. *Id.* Petitioner further reported thigh burning and chest pain with exercise, and an "occasional choking feeling." *Id.* Dr. Barboi's impression was "1. [a]utonomic neuropathy, worse after flu vaccination or caused by it; 2. [m]ild hypermobility and r[ight] sided weakness likely congenital; 3. [m]igraine [headache] associated with vision blurring r[ight] eye; and 4. C[arpal] T[unnel] S[yndrome][23] mild bilateral." *Id*. at 227.

### ii.  Damages Stage Medical Evidence

Petitioner was seen for follow-up treatment of her small fiber neuropathy by Dr. Barboi from May 3, 2016 through March 11, 2021. *See* Pet'r's Ex. 88. During her 2016 pregnancy, Petitioner continued under the care of the neurologist for monitoring and reported a "bad flare up December [2015] to February [2016], pain wise." *Id.* at 54. Dr. Barboi advised that pregnancy can aggravate symptoms. *Id.* at 3, 35. Records from Petitioner's April 5, 2018 exam reveal that her small fiber polyneuropathy seemed stable, although she continued to suffer from migraine headaches. *Id.* at 45. During a routine visit on March 12, 2020, Petitioner reported to Dr. Barboi that she was working full time and taking care of her two young sons. *Id.* at 35. Her symptoms had progressed and included foot, trunk and arm pain made worse with activity. *Id.* Petitioner reported a burning sensation with an increase in body temperature and noted that she was unable to exercise anymore. *Id.* Her medical history noted that her small fiber neuropathy had plateaued in 2012; however, the record described "flare ups [ ] lasting 1–2 weeks." *Id.* On August 3, 2020, Dr. Barboi evaluated Petitioner's complaints of numbness via nerve conduction studies, which were normal, and an electromyography ("EMG"),[24] which revealed no abnormalities. *Id* at 21. Following Petitioner's 2021 pregnancy, Dr. Barboi saw Petitioner and determined that although there was evidence of ganglionopathy,[25] Petitioner's small fiber neuropathy remained stable. *Id.* at 3.

### B.  Affidavits[26]

---

[23] Carpal Tunnel Syndrome is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow. Symptoms result from compression of the median nerve in the carpal tunnel." *Dorland's* at 1794.

[24] Electromyography is "an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation." *Dorland's* at 595.

[25] Ganglion is "anatomic terminology for a group of nerve cell bodies located outside the central nervous system[.]" *Dorland's* at 751.

[26] Petitioner's mother and husband submitted affidavits as part of the damages phase of this case.  Pet'r's Exs. 153–54, ECF Nos. 146-6–146-7. I have reviewed both statements and note that they are consistent with Petitioner's accounts of her clinical progression and the difficulties she has faced living over the years with SFN. This case has been pending for several years, and there have been hundreds of exhibits and thousands of pages of discovery filed. Over the course of this litigation, all the filed documents have been reviewed for relevance and persuasiveness. Filings that offer the best source of evidence or argument will be individually referenced. Several articles and witness statements that offer support will not be detailed due to the impracticality of individually identifying every document. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F.

### i. Affidavit of Dr. Barboi

Dr. Barboi submitted an affidavit, dated July 27, 2023, in which he described his treatment of Petitioner since February 6, 2014. Pet'r's Ex. 160 ¶ 1, ECF No. 146-13. Dr. Barboi noted that Petitioner was diagnosed with SFN prior to his first visit with her. *Id.* ¶ 6. At that time of his "initial evaluation, [Petitioner's] SFN had plateaued and was stable." *Id.* She was complaining of limb pain and "the intermittent flare-ups of SFN that occurred at busy times during her work as an attorney." *Id.* Dr. Barboi and Petitioner discussed her unsuccessful use of acupuncture and B12 treatments, along with prescription pain medications and antidepressants, to treat her symptoms. *Id.* They continued to try various medications to treat Petitioner with no luck through 2014. *See id.* ¶¶ 7–8. During Petitioner's significant 2015–2016 flare, Dr. Barboi "emphasized the need for sleep, rest and reduced stress to best manage her SFN symptoms." *Id.* ¶ 9. Petitioner saw Dr. Barboi two more times for routine follow-ups on April 5, 2018, and March 12, 2020. *Id.* ¶ 10. He noted that her symptoms were stable, and he had "little to offer in terms of medical treatment to alleviate those symptoms." After Petitioner reported increasing symptoms in 2020, she and Dr. Barboi "discussed different strategies for managing her symptoms outside of medications[,] . . . includ[ing] a significant discussion regarding how the time demands, stress and pressure from [Petitioner's] employment exacerbate [her] SFN symptoms." *Id.* As of 2021, Petitioner's "SFN had not progressed," and she and Dr. Barboi again "discussed her responsibilities and hours, and how her employment obligations negatively impact her ability to manage her SFN symptoms and reduce her pain." *Id.* ¶ 13. He "emphasized the need for rest and reduced stress to allow [Petitioner's] SFN symptoms to subside and hopefully return to the baseline." *Id.*

On March 14, 2022, Petitioner saw Dr. Barboi with complaints of "a substantial increase in her SFN pain and symptoms in the setting of her long work hours." *Id.* ¶ 14. Dr. Barboi advised that Petitioner's 20% reduction in work hours "is a reasonable and necessary accommodation to better control the pain and fatigue caused by [Petitioner's] SFN." *Id.* ¶ 16.

### ii. Petitioner's Entitlement Affidavits and Testimony

Petitioner submitted three affidavits and testified during the entitlement hearing. *See* Ruling at 12–14; Pet'r's Ex. 5, ECF No. 1-14; Pet'r's Ex. 11a, ECF No. 9-1; Pet'r's Ex. 14, ECF No. 25-1; Tr. 31–65. That evidence was detailed in my Ruling on Entitlement and will be summarized here as relevant specifically to damages. *See generally* Pet'r's Ex. 11a. Petitioner described her pre- and post-vaccination lifestyles. *See generally* Pet'r's Ex. 11a. Petitioner indicated that before the flu vaccination at issue, she enjoyed playing various sports including soccer, basketball, tennis, skiing, and biking. Pet'r's Ex. 11a ¶¶ 2a, 2c; Ruling at 13. She noted that she typically exercised four to five times per week, including running outside and working out at a gym. *Id.* Petitioner noted that prior to the vaccine, she "was in law school, completed a summer associate program with a law firm and accepted a job as an associate at the same law firm to begin after graduation[.]" *Id.*

Petitioner asserted that after receiving the flu vaccine on August 23, 2011, she experienced difficulties attending [ ] law school. *See generally* Ruling at 12–14; Pet'r's Exs. 5, 11a, 14; Tr. 31–65. She noted that she "missed classes and law school commitments for a variety of reasons all

---

App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines-the conclusion that it was not considered.").

related to the vaccine." Pet'r's Ex. 11a ¶ 8a. Specifically, Petitioner indicated that "[i]t was difficult to study for long amounts of time due to vision issues and pain in [her] right eye . . . [and t]he pain and tremors in [her] hands and arms[.]" *Id.* Petitioner also noted she applied for and received accommodations, including extra time and reduced typing requirements for her law school and [state] bar exams. *Id.* She asserted that the accommodations helped "to decrease the stress on [her] body to help to lessen the pain [she] experienced." *Id.*

Petitioner noted that she began her position at her law firm in October 2012. *Id.* ¶ 8b. She stated she "ha[d] not missed a significant amount of time from this job . . . but the symptoms [she] experience[d] from the small fiber neuropathy ha[d] made [her] job very difficult at times." *Id.* For example, she noted she experienced "pain in [her] right eyes, which often decreases the vision in [her] right eye." *Id.* ¶ 8bi. Petitioner indicated that the pain she experienced in her eyes, head, and extremities made it difficult to work for long hours. *Id.* ¶¶ 8bi–8biv. Petitioner also asserted that her pain and symptoms increased "at times of high stress, excitement, fatigue[,] or when [her] other symptoms are causing pain." *Id.* ¶ 8bii. Overall, Petitioner stated she was "finding it very difficult to maintain the pace [her] job requires." *Id.* ¶ 8bv.

During her testimony, Petitioner was asked about how she is able to keep up with her demanding job responsibilities despite her symptoms. Tr. 45:2–14. She indicated that she sometimes works remotely from home to better manage her symptoms and because of this, she can successfully handle her workload. Tr. 44:1–9. In larger moments, such as hearings or depositions, Petitioner stated she experiences numbness and pain in her arms, tremors in her hands, eye pain, blurred vision, and headaches. Tr. 60:6–19. She stated she works through the pain with very minimal accommodations. Tr. 61–64.

### iii. Petitioner's Damages Affidavits

After I issued my Ruling, Petitioner submitted two additional personal affidavits in support of her claim for future earning capacity loss. Pet'r's Ex. 152, ECF No. 146-2; Pet'r's Ex. 163, ECF No. 148-1. She identified her current primary SFN symptoms as pain and burning in her hands, wrists and forearms, feet, upper thighs up to the hip joint; blurred vision and pain in her right eye; headaches; and fatigue. Pet'r's Ex. 152 ¶ 2. Petitioner added that her "SFN symptoms are frequently exacerbated by stress, pressure, situations of extreme excitement and a lack of sleep[.]" *Id.* ¶ 3. Over the years, Petitioner has treated her symptoms with various prescription medications, vitamins and supplements, alternative therapies (acupuncture and massage therapy), exercise, a transcutaneous electrical nerve stimulation device, and various neuropathy creams. *Id.* ¶ 4. She stated that these treatments were either ineffective or exacerbated her symptoms and that they were all ultimately ceased. *See id.*

Remedies that Petitioner described as temporary pain management and relief measures include hot and cold packs, arm splints, leg and feet elevation, eye drops and ibuprofen. *Id.* ¶ 5a– f. Petitioner also noted that "[c]onsistent opportunities for rest and sleep along with longer periods of rest of sleep are more effective at reducing [her] pain and SFN symptoms." *Id.* ¶ 5g. She has also adjusted "physical activities and demands." *Id.* ¶ 5h. Petitioner described how she worked remotely on Fridays during the pandemic, but starting in 2022, when her "firm returned to in-office work expectations, [she] generally tr[ies] to work from home two days a week to avoid the strain of commuting to the office." *Id.* At home, Petitioner "limit[s] the amount of times [she] pick[s up]

and hold[s her] young children." *Id.* Her husband "takes on the more physical demands or needs" with the children and around the house. *Id.* The family has a hired a family chef, landscapers, and housekeepers "so that [she] can avoid these physically demanding activities." *Id.* Every day, Petitioner experiences pain and fatigue. *Id.* ¶ 7. She stated that "working almost every night, as was typical until very recently, was painful, difficult and further contributed to the fatigue by reducing the among of sleep [she] could get." *Id.*

Over the course of her career, Petitioner had "significant periods of time between 2016-2021 where [her] work responsibilities, stress and pressure were greatly reduced, or entirely eliminated[,]" including three periods of twenty-four-week maternity leaves. *Id.* ¶ 14a. During these times, Petitioner "was completely disconnected from work and all clients." *Id.* Additionally, during the pandemic, she "primarily worked remotely from [her] home. This eliminated [her fifty to fifty-five-minute] commute each way to and from the office." *Id.* ¶ 14b. This office remote work policy "provided more flexibility in the hours/time frame during which [she] completed [her] work and a private setting in which to try to manage [her] SFN symptoms as [she] worked." *Id.* Following the pandemic and the birth of her third child, Petitioner returned to work as the lead for the remote trial team in "a massive federal multidistrict litigation [ ]." *Id.* ¶ 15. Petitioner described the work, pressure and stress she experienced during that time and stated that "[t]o this day, [her] daily SFN symptoms are worse than before this trial began." *Id.*

In [Year], when Petitioner became a Partner at her law firm, her work responsibilities expanded to include associate management and client development. *Id.* ¶ 16. Petitioner explained that her typical office workday begins at 5:30 am with email review and ends around midnight when she ultimately stops working for the day. *Id.* ¶ 17. Her schedule includes breakfast and morning preparation for her children, a fifty-one-minute train commute during which time she works, a working lunch, and family time each night from 5:35 to 8:00 pm. *Id.* This schedule and the new pressures she experiences inherent in her role as a Partner have "elevated [her SFN symptoms] as compared to early in [her] career and has become unbearable and impossible to manage." *Id.* ¶ 19. Petitioner added that "[t]he everyday stress of raising a family and maintaining a marriage is not comparable to the 'stress' from work that substantially impacts [her] symptoms or causes excess fatigue." *Id.* ¶ 20. She noted that "[m]ore generally, as a litigator at [law firm], the demands of [the] job and [the] clients nearly always come with high stakes, intense pressure and complicated issues requiring careful scrutiny." *Id.* ¶ 22.

Petitioner concluded after making partner that she "would not be able to maintain the pace and demands of [the] position[.]" *Id.* ¶ 24. She acknowledged that her "SFN symptoms were exacerbated by [her] work demands, [and she is now] facing the long term impact on [her] health and the substantial truncation this would have on [her] work life if [she] continue[s] pushing beyond [her] limits[.]" *Id.* In 2022, Petitioner began looking for a different legal position and applied for an in-house counsel position. *Id.* ¶ 25. Towards the end of the hiring process, Petitioner learned that the "position that [she] had applied for would no longer be filled." *Id.* Other barriers to finding alternative employment including the risk that her law firm would learn about her job search and a lack of qualifications for the legal positions that she sought. *Id.* ¶¶ 26, 28. Petitioner continues to search for "a litigation position at a company with an expectation of approximately [forty] hours a week and an environment removed from the high-intensity, fast paced world that [she] currently work[s] in." *Id.* ¶ 27. While engaging in her search in March of 2023, Petitioner revealed her diagnosis to her employer and explained that she "could no longer continue working

in the manner [she] had been working and indicated [she] needed to leave [law firm]." *Id.* ¶ 30. Alternatively, her managing partner "offered to reduce [her] required client hours to 80% of the 2,000 hour requirement so that [she] could assess whether a reduction in these hours would help [her] symptoms improve." *Id.* Petitioner admitted that she did not believe this solution was feasible, but her managing partner "offered to adjust [her] responsibilities and roles on case teams to try to create the schedule [she] need[s]. *Id.* ¶ 32. Additionally, Petitioner was told that she "can likely maintain [her] position as a partner at an 80% schedule[,] but further reductions in [her] schedule and responsibilities would likely require a change in [her] position from a 'partner' to an 'of counsel' position." *Id.* Despite implementing these changes and working one month during a trial period at 60%, Petitioner stated that she "did not experience a significant improvement in [her] SFN symptoms." *Id.* ¶ 33. Ultimately, Petitioner stated that she does "not see a path forward to remain a partner at [law firm] given the limitations in [her] schedule and work demands that are required to allow [her] to better manage [her] SFN." *Id.* ¶ 38. Petitioner's supplemental affidavit was an explanation of Petitioner's Exhibit 164, which is a compilation of Petitioner's work hours from 2012 through 2022, and Petitioner's Exhibit 165, which reflects her work hours in 2023. *See* Pet'r's Ex. 164, ECF No. 148-2; Pet'r's Ex. 165, ECF No. 148-3. These exhibits include client billable, client non-billable, pro bono, office and public service hours. Pet'r's Ex. 163 ¶¶ 8, 10.

### III.   Expert Evidence

#### A.   Petitioner's Experts

##### i.   Kelly Deeker, O.T.D.

Dr. Deeker received her undergraduate degree from McKendree College and a doctorate in occupational therapy from Washington University School of Medicine. Pet'r's Ex. 90 at 2, ECF No. 117-2. She has worked as a registered and licensed occupational therapist since 2017. *Id.* In total, Dr. Deeker has over eighteen years of clinical, research and forensic consulting experience. *Id.* at 1. Her forensic experience focuses "on the evaluation of work capacity for individuals with cognitive and musculoskeletal disabilities." *Id.* Dr. Deeker is also a "Certified Vocational Evaluator and is qualified to administer physical and psychological assessments, and she has trained extensively in data collection methods and analysis." *Id.* She is an author/coauthor of several articles "related to vocational assessment, functional capacity evaluation and return to work." *Id.*

##### ii.   Leonard N. Matheson, Ph.D.

Dr. Matheson received his undergraduate degree in psychology and a master's degree in developmental psychology from the University of Southern California. Pet'r's Ex. 91 at 2, ECF No. 117-3. He obtained a second master's degree in clinical psychology from Pepperdine University and his doctorate in the psychology of adult development and aging from the University of Southern California. *Id.* Dr. Matheson has been a licensed psychologist, certified vocational evaluator, and rehabilitation counselor for over thirty-five years. *See id.* Over the course of his career, Dr. Matheson has served as a Professor of Psychology and a member of several professional societies, including the American Psychological Association. *See id.* at 5–6. He has published more than sixty peer-reviewed papers and presented more than 150 invited papers and chapters in psychology, medicine, and rehabilitation. *See id.* at 16–35.

### iii. Lawrence Steinman, M.D.

Dr. Steinman received his medical degree from Harvard University in 1973. Pet'r's Ex. 45 at 1, ECF No. 60-1. He completed his post-graduate training at Stanford University, where he completed an internship in surgery in 1973, a residency in pediatrics in 1974, and a residency in pediatric and adult neurology from 1977 to 1980. *Id.* He became board-certified in neurology in 1984. *Id.* at 2. He served as the Chairman of the Immunology Program at Stanford for approximately ten years from 2002 to 2011. *Id.* He currently serves as a Professor of Neurology, Pediatrics, and Genetics at Stanford University's Department of Neurology and Neurological Sciences. *Id.* Dr. Steinman's curriculum vitae includes over four-hundred and fifty published articles of which he is a listed author. *See id.* at 5–40. Dr. Steinman submitted three expert reports and testified during the entitlement phase of this case. Pet'r's Ex. 40; Pet'r's Ex. 78, ECF No. 85-1; Pet'r's Ex. 84; Tr. 79–152, 245–260. During the hearing, he noted that he "did a post-doctoral fellowship in neuroimmunology[.]" Tr. 80:14. He explained that his clinical practice involves "see[ing] patients, both inpatients and outpatients . . . [with] neuroimmunological diseases." Tr. 80:20, 81:6. He also stated that he has testified many times in the Vaccine Program. Tr. 83–84. Dr. Steinman has "never had occasion to be asked to comment on a medical opinion, after a decision has been made on entitlement." Pet'r's Ex. 136 at 1, ECF No. 134-1.

### iv. Mark S. McNulty, Ph.D.

Dr. McNulty received his bachelor of science degree in economics and mathematics at the University of South Dakota and his Ph.D. in economics and statistics at Iowa State University. Pet'r's Ex. 139 at 1, ECF No. 137-2. He currently conducts economic and statistical analysis for Economic Solutions, LLC and has experience as a researcher at the University of Wisconsin and a professor at Kansas State University. *Id.* at 1–2. Dr. McNulty is a member of the American Economic and American Statistical Associations and has authored/co-authored several publications in his field. *Id.* at 2–6.

### B. Work Capacity Evaluation

Petitioner's work capacity evaluation authored by Dr. Deeker begins with a summary of her medical records and the affidavits filed in this case. *See* Pet'r's' Ex. 89 at 1–22, ECF No. 117-1. The report then notes that prior to her in-person testing, Petitioner met with Dr. Deeker twice, via video conference. *Id.* at 23. Dr. Deeker noted that Petitioner "sat with good posture" and "walked with an even, balanced and apparently comfortable gait." *Id.* Dr. Deeker described Petitioner as "fully oriented to person, place, time, and purpose of the interview." *Id.* Her affect was appropriate, and her memory appeared to be within normal limits." *Id.* Dr. Deeker described Petitioner's speech as "fluid, without pressure, retardation, or dysarthria." *Id.*

A self-report section includes background information provided by Petitioner. *See id.* at 23–27. She reported that prescription medications do not help her pain and symptoms, and she relies on her "own process using ice packs, arm braces, elevating [her] legs, moving around frequently and wearing slippers[.]" *Id.* at 24. Over-the-counter pain medications "are moderately effective" for "right eye pain and headaches." *Id.* Petitioner reported that she uses ibuprofen "typically a few times a month." *Id.* Petitioner then described the ins and outs of her position with her law firm and her level of job satisfaction. *Id.* Petitioner told Dr. Deeker that pre vaccination,

she planned to work until age sixty-seven, but she has reached her "breaking point and [she does not] know how long [she] can keep doing this (working at this level)." *Id.* at 24–25.

Pain and fatigue are the problems that Petitioner reported "interfere with her ability to physically and cognitively focus to complete her work at the same level and in the same amount of time that she was able to do previously." *Id.* at 25. Petitioner noted that her symptoms are ever-present, and she has no way to manage her symptoms or get relief. *Id.* It now takes Petitioner fifteen to sixteen hours a day to complete work she could previously do in twelve hours because of cognitive difficulties. *Id.* Petitioner identified her goals, "To live a life with less pain. To create a lifestyle with more of a balance . . . spend quality time with [her] children, and to have some personal time. To pursue a hobby. To read a book." *Id.* Prior to vaccination, she reported being able to exercise, cook, garden, and work out in the yard "without limitations." *Id.* Now, Petitioner "has to pick and choose" her activities and deal with any subsequent pain as best she can. *Id.* She is also planning a career change and noted that "[i]t will probably take [one to two]2 years of investigating to find something new[,] and ideally [her] new career will be less work and offer a slower pace." *Id.* at 27.

Petitioner also reported functional tolerances. *See id.* at 27–31. She can sit and stand for thirty to sixty minutes, but eventually she will feel pain, including burning and tingling in her thighs. *Id.* at 27. During flareups, Petitioner stated that "standing for even [five] minutes is difficult, almost unbearable." *Id.* Petitioner "reported she experiences flare-ups of her symptoms weekly." *Id.* She is unable to walk up to thirty minutes without a break, and even "walking short distances frequently throughout the day will add up to increased pain, fatigue and increased severity of burning symptoms in her legs/thighs and the bottoms of both feet at the end of the day." *Id.* Petitioner reported problems falling asleep but not staying asleep. *Id.* The "primary, number one issue[]" for Petitioner is fatigue. *Id.* at 28. Petitioner stated,

> [I]t is not uncommon for her to work until 1:00 AM to 2:00 AM, and when she works until early hours of the morning, her body isn't able to recover and her symptoms are not able to completely reset in the [four to five] hours of sleep she receives at night.

*Id.*

Specifically, Petitioner described her pain by level and location. *See id.* at 31–33. She rated her symptoms "at level 5 on a zero to 10 visual analogue scale with zero being 'no pain' and 10 being 'worst possible pain.'" *Id.* at 31. The pain is exacerbated by "increased activity, stress, and lack of rest." *Id.* Petitioner identified burning and aching bilateral forearm and hand pain, stabbing and burning bilateral groin and thigh pain, and burning bilateral foot pain. *Id.* at 32. She also noted stabbing pain in her right eye. *Id.* Her pain is "constant[,] and she is never without pain or discomfort." *Id.*

The self-report section was followed by vocational evaluation report that was based on three video conference evaluation sessions in March and April of 2022. *See id.* at 33–39. As part of a Multi-Dimensional Task Ability Profile ("MTAP"), Petitioner was asked to identify and measure any "functional limitations as they may affect her ability to work." *Id.* at 34. The test compared Petitioner's abilities pre-vaccination in July 2011, immediately before she began at her

law firm in October 2012, and at the time of the test in the morning and evening hours in March of 2022. *Id.* The MTAP "demonstrate[d] considerable and dependable degradation of [Petitioner's] functional capabilities over the past [eleven] years." *Id.* at 39. Petitioner also underwent a Disabilities of the Arm, Shoulder, and Hand ("DASH") questionnaire, which revealed a 31% upper extremity disability rating. *Id.*

Drs. Deeker and Matheson submitted a supplemental work capacity evaluation report wherein they focused on the direct relationship between Petitioner's pain and fatigue and her cognitive impairment. Pet'r's Ex. 124 at 6–7, ECF No. 133-1. The report notes that the examiners are unable to attribute specific "symptoms to a particular diagnosis[;]" however, they are qualified to assert that "cognitive impairment is a common consequence of pain and fatigue[.]" *Id.* The reports explains that "pain interferes with attentional capacity, processing speed and psychomotor speed, and fatigue diminishes the ability to sustain attention and concentration, and also slows reaction time and processing speed [ ]." *Id.* at 7. In Petitioner's case, there are "distinct and meaningful relationships between her work tasks and her reports of pain and fatigue[,]" and she "experiences the task-avoiding and distracting and fatiguing consequences of pain." *Id.* Indeed, Petitioner "has only been able to achieve her excellent performance in her last year of law school and achieve and maintain employment and make progress in her chosen career because she brings extraordinary effort that cannot be sustained indefinitely." *Id.* at 10. The supplemental report reiterates points articulated in the initial report along with an emphasis on Petitioner's credibility with respect to her self-assessments. *See generally id.* The supplemental report also notes that Petitioner's "responsibilities as a wife, mother, and family household contributor must also be considered as a rational rehabilitation plan is developed." *Id.* at 20. Petitioner's weekly/regular employment of a housekeeper, cook, landscaper, and nanny are "inadequate to allow her to meet her vocational responsibilities without substantial symptom exacerbation[; therefore], it is logical to turn to accommodations in her career." *Id.*

### C. Loss of Earning Capacity Evaluation

Drs. Deeker and Matheson also evaluated Petitioner for her "work capacity and rehabilitation potential." Pet'r's Ex. 99 at 1, ECF No. 118-1. The report includes sections detailing Petitioner's background and diagnosis. *See id.* at 1–2. Petitioner described her symptoms immediately post-vaccination in 2011–2012 and noted that "[s]he worked with [her law] school to receive accommodations to help her conserve energy and optimally manage her other symptoms[.]" *Id.* at 2. She also noted that in order to pass the [state] bar examination, Petitioner "requested and received accommodations to manage her lower levels of cognitive efficiency and productivity." *Id.* Petitioner began working as an associate with her law firm immediately upon graduation and remained there for over a decade during which time, she ascended to Partner in [Year]. *Id.*

Despite Petitioner's professional trajectory, she reported that "the small fiber neuropathic process has seriously worsened her symptoms, impairments, and functional limitations." *Id.* The report states that "her current work activities dependably lead to serious exacerbation of her symptoms that have been identified in the peer-reviewed literature as related to [SFN]." *Id.* Drs.

Deeker and Matheson cited the Lodahl et al. paper[27] that identifies fibromyalgia[28] as a co-morbidity of SFN and notes that many patients with the former condition have symptoms of the latter. Pet'r's Ex. 101 at 1, ECF No. 118-3. The article defines fibromyalgia and identifies the most common symptoms as "widespread chronic pain, fatigue, exercise intolerance, gastrointestinal symptoms and cognitive concerns." *Id.* Due to the potential condition overlap, the authors suggest that "patient reported symptoms might help screen patients with fibromyalgia for the presence or absence of [small fiber polyneuropathy.]" *Id.* at 5. Drs. Deeker and Matheson also cited a paper by Treister et al.,[29] who sought to develop a symptom survey aimed at "help[ing] clinicians diagnose and assess treatment responses[.]" Pet'r's Ex. 102 at 1, ECF No. 118-4. Treister et al. identified the most severe symptoms for patients with confirmed SFN as tiredness or fatigue, reduced endurance or strength, deep pains or aches, tingling, and difficulty thinking, concentrating, or remembering. *Id.* at 5. The large sample size and three-year duration strengthened credibility of the study, but limitations included an inability to "distinguish between primary versus secondary symptoms, for instance caused by medications, co-morbidities, or inactivity." *Id.* at 6.

Petitioner identified several current symptoms that "affect her work capacity, including fatigue, diminished endurance, headache pain and cognitive dysfunction." Pet'r's Ex. 99 at 2. Other reported symptoms "interfere with her attempts to maintain fitness, including activity-related dysesthesias and musculoskeletal and cutaneous pain, tingling and numbness." *Id.* at 2–3. Petitioner stated that "[h]er symptoms cycle throughout the workday in response to work tasks, with her next-day recovery baseline worsening in the past year." *Id.* at 3. The evaluation revealed "a gradual deterioration of her daily work capacity[]" as she has aged, and her examiners identified twenty-eight functional limitations. *Id.* The report notes that "most of [Petitioner's] functional limitations do not directly impact her work tasks[]" but that "[s]everal of her work tasks precipitate additional pain and fatigue that further interferes [sic] with her cognitive work capacity." *Id.* Consequently, "[a]s she moves through middle-age, her trajectories of diminishing physical and cognitive reserve capacity will accelerate more rapidly than they would have without her [SFN]." *Id.* at 4.

The next section of the report is a detailed account of the context of lawyering and general work activities. *See id.* at 4–10. Competition, time pressures, conflict resolution and negotiations are common components of Petitioner's occupation. *See id.* at 5–6. Petitioner described difficulties doing her job, noting she was "[v]ery busy[]" with "no time for breaks/lunch; on all the time; making lots of decisions[.]" *Id.* at 7. She continued that her "[r]estriction is the pain/symptoms[,]" and "[s]tress increases symptoms." *Id.* The report lists "two major consequences that the [SFN] disease imposes on [Petitioner's] lifetime earning capacity[,]" the first being "a lower trajectory of earnings growth compared with the trajectory she would have enjoyed without her symptoms and functional limitations[]" and the second being "functional limitations on the duration of her career, exiting earlier than she would have[.]" *Id.* at 12.

---

[27] Mette Lodahl et al., *Specific symptoms may discriminate between fibromyalgia patients with vs without objective test evidence of small-fiber polyneuropathy*, 3(1) PAIN REPORTS 1 (2018).

[28] Fibromyalgia is defined as "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Dorland's* at 703.

[29] Roy Treister et al., *Initial development and validation of a patient-reported symptom survey for small-fiber polyneuropathy*, 18(5) J. PAIN 556 (2017).

Drs. Deeker and Matheson analyzed Petitioner's compensation history. *Id.* at 13. She consistently received increases in annual salary every year, ranging from a low 2% increase due to the "the continued economic uncertainty caused by COVID-19" to a 26.6% increase in salary in 2019 on her way to Partner. *Id.* Ultimately, "the success of [law firm] partially explains the extraordinary growth in her compensation compared to other [l]awyers [nationwide,]" and "even within [law firm], [Petitioner's] success in terms of her growth and earnings has been extraordinary[.]" *Id.* at 15.

When compared with Americans with disabilities, Petitioner's earnings are even more stark. *See id.* at 18–19. The report details higher levels of unemployment, lower levels of compensation, and a "faster and earlier decline in employment over the lifespan." *Id.* Drs. Matheson and Deeker asserted that "[d]ecades of peer-reviewed research and clinical experience support the likelihood that if adjustments to [Petitioner's] work demands are not made, her gradually diminishing work capacity will cause substantial truncation of [Petitioner's] work life." *Id.* at 20. Petitioner reported that she considered "approach[ing] her employer for accommodations within the [Americans with Disabilities Act ("ADA")] employment discrimination guidelines." *Id.* at 21. She explained, "[it is] not working for[her family and herself], this world that [she has] created, and [she] need[s] to explore what [her] options would be to take a step back in terms of [her] time commitments." *Id.* However, "she has doubts about whether accommodations would be possible for her employer to offer, given the exigencies and emergency demands of her position and the expectations of her corporate clients." *Id.* Petitioner also discussed other potential employment possibilities with less strenuous expectations for total hours worked, including as a mediator or in-house counsel. *Id.* at 21. Drs. Matheson and Deeker recommended a ten-year hiatus from "Big Law" and that she only return "with better symptom management and fitness to attenuate and accommodate her functional limitations." *Id.* at 23.

S.C., Petitioner's friend and law school classmate, was interviewed as a part of the evaluation "to get a better understanding of [Petitioner's] career dynamics and options that may be worth considering." *Id.* at 24. S.C. reported that she has known Petitioner since the first day of law school and remembered how she "buckled down and pushed herself" to finish, despite the onset of SFN. *Id.* When asked about Petitioner's current work schedule, S.C. described Petitioner's "2000 hours of billing per year [as] unreasonable." *Id.* S.C. continued that Petitioner "probably bills at least that much and maybe as much as 2300 [hours] each year, plus accruing nonbillable hours in additional work." *Id.* She reported telling "encouraging [Petitioner] to develop better boundaries about her workday." *Id.* S.C. also previously worked as a corporate attorney, but she now she serves as an associate general counsel and provides "legal guidance to the healthcare industry." *Id.* This career change improved her work/life balance, and she now has "the flexibility to take care of [her] children and be involved with [her] husband." *Id.* S.C. implied that she took a pay cut and "was counseled by a mentor who took a similar path from litigation to a stable and reasonable salaried position." *Id.* at 25. She stated that she is "doing things that matter to [her] right now[,]" and even with some regrets, she can go back to litigation when her kids are older. *Id.*

Petitioner expressed a desire to meet specific goals, including: less pain, more life balance, more personal time and time with her children, the pursuit of a hobby, and to read a book. *Id.* In response, Drs. Matheson and Deeker recommended "a biopsychosocial interdisciplinary rehabilitation program[,]" including alternate employment with a maximum work week of forty hours; an interdisciplinary medical team consisting of a neurologist, rheumatologist, occupational

therapist, physical therapist, rehabilitation psychologist, counsel, and a family therapist; and a work life balance plan. *Id.* at 26–27.

Following her evaluation, Drs. Deeker and Matheson articulated three scenarios for work-life expectancy for Petitioner. *Id.* at 28–30. They opined that "[e]xcept for her work-exacerbated symptoms and functional limitations, [Petitioner] would have enjoyed age-appropriate retirement." *Id.* at 28. Petitioner's "tremendous dedication" and career success would place her in the 75th percentile work-life expectancy for retirement at 69.5 years of age. *Id.* at 29. Using Petitioner's 2022 salary ($675,000) and assuming a worst-case scenario of no merit raises or profit sharing, the 4.5% annual salary increase taken from the Employment Cost Index until Petitioner reached 69.5 would result in lifetime earnings of $59,710,447. *Id.* Under the second scenario, Petitioner's SFN and her current job demands, would place her in the 10th percentile for work-life expectancy and result in a loss of work life of seventeen years or $37,712,904 (compared to scenario one). *Id.* The third scenario contemplates Petitioner leaving [law firm] to achieve a forty-hour work week, albeit at a significantly lower salary. *Id.* at 29–30. Drs. Matheson and Deeker opined that in this new position, Petitioner's work-life expectancy would be reduced to 64.5 years of age at retirement. *Id.* at 29. The lower salary and decreased number of working years would result in a net loss of $45,835,234. *Id.* at 30. The report also mentions a fourth scenario wherein Petitioner is able to take a ten to fifteen year hiatus from her law firm, receive rehabilitation services and benefit from long-term improvement in SFN treatment, and "return to her career path as a litigator at age [forty-five] or [fifty]." *Id.* In this case, Petitioner's work-life expectancy would return to the baseline in scenario one of 69.5; however, "[e]stimated wage loss . . . is not reasonable because there are too many unknowns[.]" *Id.*

### D. Supplemental Expert Report of Dr. Steinman

Dr. Steinman submitted a post-entitlement report in this case to explain how specific symptoms Petitioner experienced can be associated with SFN. *See* Pet'r's Ex. 136 at 1–2. Dr. Steinman cited the MacDonald et al. study,[30] in which the authors noted that six percent of SFN patients in their study also suffer from gait impairment that was believed to be related to the neuropathy. *Id.* at 1 (citing Pet'r's Ex. 137 at 3, ECF No. 134-2). Dr. Steinman extrapolated this finding to the upper body and asserted that "[o]ne could easily understand that if the upper and lower extremities are affected in SFN that there would be 'difficulty with lifting or moving objects[.]'" *Id.* Responding to Respondent's expert, Dr. Gibbons, Dr. Steinman also opined that chest pain, along with "'weakness, difficulty with lifting or moving objects, difficulty with exercise, [and] fatigue[,]' [] may well be ascribed to the persistent pain that Petitioner is dealing with." *Id.* at 1–2. Lastly, Dr. Steinman described a connection between cognitive decline and SFN based on the Lodahl et al. article. *Id.* at 2 (citing Pet'r's Ex. 101 at 1–2). He cited their explanation that brain fog can occur due to SFN because "central axons of peripheral nervous system sensory fibers penetrate into the spinal cord, and some ascend to the brain[.]" *Id.* (quoting Pet'r's Ex. 101 at 1–2).

### E. Economist Expert Report

---

[30] Steven MacDonald et al., *Longitudinal follow-up of biopsy-proven small fiber neuropathy*, 60 MUSCLE NERVE 376 (2019).

Dr. McNulty calculated that "the probable value of Petitioner's lost earnings capacity is at least $21,199,427 in net present value. Pet'r's Ex. 138 at 7, ECF No. 137-1. This number is based on her annual compensation "growing [to] $675,000 at age [thirty five and growing] by 4.9881% per year to age [sixty-seven,]" averaging an earning stream of $1,584,816 per year. *Id.* at 3. Using the retirement age Drs. Matheson and Deeker submitted of 69.5, the lost earnings increase to $24,958,248. *Id.* at 6

### F. Respondent's Experts

#### i. Christopher Gibbons, M.D.

Dr. Gibbons is a board-certified neurologist with an undergraduate degree from Dartmouth College and a medical degree from Albert Einstein College of Medicine. Resp't's Ex. P at 1, 19, ECF No. 126-2. Following postdoctoral training that included an internship at Greenwich-Yale New Haven Hospital, a residency in neurology at Johns Hopkins Hospital, and a fellowship in clinical neurophysiology at Beth Israel Deaconess Medical Center, Dr. Gibbons began as a professor at Harvard Medical School. *Id.* at 1. He serves on several boards for pharmaceutical companies, medical academies, and societies, including the American Academy of Neurology and the Peripheral Nerve Society. *See id.* at 1–3. Dr. Gibbons has presented to members of the national and international medical community and published scholarship on small fiber neuropathy. *See generally id.*

#### ii. Behnush Mortimer, Ph.D.

Dr. Mortimer received an undergraduate degree in recreation therapy from San Diego State University and a Ph.D. in psychology with specialization in industrial organizational psychology from Capella University. Resp't's Ex. R at 2, ECF No. 126-4. Dr. Mortimer is currently a vocational rehabilitation consultant in San Diego, with prior experience as a vocational expert and as adjunct faculty in rehabilitation counseling. *Id.* at 1–2. Dr. Mortimer has experience in "vocational evaluation (including administering and interpreting of vocational tests), job analyses, labor market surveys, wage earning capacity, vocational plan development and monitoring, job development and job placement utilizing demographic and nationwide statistics, ergonomic recommendations, job accommodations, and program management." *Id.* at 1.

### G. Expert Report of Christopher Gibbons, M.D.

Dr. Gibbons' report includes two tables pulled from supporting literature that detail symptoms commonly seen in SFN patients. Resp't's Ex. O at 2–3, ECF No. 126-1 (quoting Resp't's Ex. O, Tab 1 at 3, ECF No. 129-1; Resp't's Ex. O, Tab 2 at 11, ECF No. 129-2).[31] Dr. Gibbons noted that Petitioner reported "burning pain/tingling in the lower extremities [that] is clearly associated with small fiber neuropathy[,]" but she also reported "a host of other symptoms such as weakness, difficulty with lifting or moving objects, difficulty with exercise, fatigue, visual blurring, headache and chest pain [that] are not associated with small fiber neuropathy." *Id.* at 6.

---

[31] Simon Haroutounian et al., *Diagnostic criteria for idiopathic small fiber neuropathy: A systematic review*, 63 MUSCLE NERVE 170 (2021); Franco Gemignani et al., *Non-length-dependent small fiber neuropathy: Not a matter of stockings and gloves*, 65 MUSCLE NERVE 10 (2022).

He also noted that "[c]ognitive impairment is not a feature of small fiber neuropathy[,]" and he identified Petitioner's other non-feature symptoms including, "weakness, difficulty with lifting or moving objects, difficulty with exercise, fatigue, visual blurring headache, and chest pain[.]" *Id.* at 3, 6. Dr. Gibbons opined that these symptoms are often not the result of SFN but could be the effects of comorbidities. *See id.*

Petitioner's neuropathic tests were recounted by Dr. Gibbons, who agreed with Petitioner's mild length dependent, small fiber neuropathy diagnosis in 2011. *Id.* at 4–5.  He stated that as of 2020, her condition had not progressed. *Id.* at 4.

### H.  Expert Report of Behnush Mortimer, Ph.D.

On September 1, 2022, Dr. Mortimer conducted a Zoom interview with Petitioner as a part of her Independent Vocational Evaluation ("IVE"). Resp't's Ex. Q at 4, ECF No. 126-3. Petitioner reported personal information, including her birthdate, educational background, family circumstances, and employment history. *Id.* at 4–6. The employment section is extensive and describes her ascension from a summer associate in law school in 2011 to her current position as a Partner with her law firm. *See id.* at 5–6. Petitioner also described her pro bono legal work and pay structure. *Id.* at 6.

The next section in the report identifies Petitioner's current reported symptoms and functional limitations. *Id.* at 6–8. Petitioner noted that her symptoms are not constant; they "wax and wane and are dependent on each day." *Id.* at 6. Fatigue was Petitioner's primary complaint, and she noted that it is worse at the end of the day. *See id.* at 7. Petitioner reported beginning her day between 5:30 and 6:00 am and going to bed at 1:00 am. *Id.* She works a hybrid schedule that includes some in-office time, some remote work, and childcare. *Id.* Petitioner stated that "a lot has changed in eleven years[,]" including becoming a parent and a law firm partner. *See id.* Fatigue is "one of the factors, of many factors[,]" that contribute to her longer workdays. *Id.*

Petitioner also reported balance issues and difficulty with tasks such as reading and driving that "seem[] to be a result of her [right] eye pain." *See id.* at 7–8. She described finger pain when attempting fine motor tasks and upper thigh and hip pain when sitting for prolonged periods of time. *Id.* at 7. Recently, Petitioner reported that it is "harder for her to process information and piece information together[,]" and she described herself as "cognitively disorganized." *Id.* at 7–8. She also reported occasional hand tremors and chest tightness and elevated heartbeat that she "was told . . .  was related to her small fiber neuropathy." *Id.* at 8. To offset some of these symptoms, Petitioner has job accommodations, including an ergonomic chair, a sit-stand desk, and a foot hammock. *Id.*

Dr. Mortimer outlined one scenario that "takes into account the medical opinions provided by Dr. Gibbons, as well as [Dr. Mortimer's] own vocational evaluation and testing[.]" *Id.* at 14. Dr. Mortimer outlined a second scenario "in review of Dr. Matheson's opinion[,]" including "a rebuttal to Dr. Matheson's analysis." *Id.* Under scenario one, "there is no actual loss in employability or earning capacity due to claims of increased small fiber neuropathy symptomology." *Id.* Citing Dr. Gibbons' report, Dr. Mortimer noted that Petitioner's symptoms "are not due to [SFN] but rather are due to other medical or psychosocial factors." *Id.* Petitioner maintained employment with her law firm and was regularly promoted with accompanying

increases in "occupational titles, duties and earnings, and . . . management duties, now at the partner level[.]" *Id.* She even continues with her "pro bono work in addition to her regular caseload and billing requirements." *Id.* She is able to perform at high vocational levels "commensurate with her education and employment history." *Id.* Dr. Mortimer opined that other stressors, "including work / life balance, effects of the Covid-19 pandemic, or other personal or medical factors[]" may be the cause of Petitioner's described vocational difficulties. *Id.*

Assuming, pursuant to the second scenario, that Petitioner's "complaints are due to an increase in polyneuropathy symptoms," Dr. Mortimer argued that Petitioner's expert relied heavily on Petitioner's complaints. *Id.* at 14–15. Dr. Mortimer explained that four out of ten of the assessments completed by Petitioner's expert during her vocational test were "subjective self reports[.]" *Id.* at 15. Three other assessments measured manual dexterity and strength, "both unrelated to [Petitioner's] field, and are well known as an area of weakness due to [Petitioner's] polyneuropathy diagnosis of 2011." *Id.* Dr. Mortimer opined that these assessments were better suited for "job positions including tasks like assembly, production, and use of tools." *Id.* He further noted that "she met aptitude levels for success in all [fourteen] career categories rating between 60% aptitude match up to 92% aptitude match across categories[,]" including her highest rating "in the communication career cluster which would be inclusive of the occupational title of Attorney." *Id.* Conversely, Petitioner's lowest rating, 60th percentile in production assembly work, is "outside her scope of regular job duties." *Id.*

Dr. Mortimer argued "there is no indication that [law firm] would more likely than not 'say no' to an accommodation request given their long term continued employment and promotions of [Petitioner] and satisfactory performance reviews." *Id.* at 16. He was unable to find a basis for Dr. Matheson's assertions that 1) Petitioner would have a worklife loss of seventeen years or even five years and 2) Petitioner would have a "Big Law" hiatus for ten to fifteen years. *Id.* at 16–17. He ultimately deferred to an economist "for pre and post incident earning and benefit calculations as well as statistical worklife commentary[.]" *Id.* at 17.

## IV.   Parties' Arguments

### A.   Respondent's Motion to Dismiss Lost Earnings Claim

On October 31, 2022, Respondent filed a motion to dismiss Petitioner's claim of lost earnings and an accompanying brief. Resp't's Mot.; Resp't's Br. Respondent noted that Petitioner's treating neurologist evaluated her on March 11, 2021, but did not mention any of the symptoms that Petitioner relies on as a basis for her claim that her "'current work activities dependably lead to serious exacerbation of her symptoms' of SFN, which affects her work capacity." Resp't's Br. at 4 (citing Pet'r's Ex. 88 at 3–11; Pet'r's Ex. 99 at 2). Respondent further noted that her neurologist, Dr. Barboi, wrote that Petitioner's SFN plateaued in 2012 and has remained stable with occasional flares that can last one-to-two-weeks. *Id.* (citing Pet'r's Ex. 88 at 3). Petitioner's complaints of migraine headaches and vision disruption are injuries unrelated to her SFN and largely responsible for any adverse effect on Petitioner's job performance. *See id.* at 4–5.

Additionally, Respondent argued that Petitioner has not established impaired earnings capacity. *Id.* at 5. He argued that unlike Dr. Mortimer's evaluation, which focused on cognitive

abilities, Petitioner's experts focused on mechanical skills unrelated to Petitioner's occupation as an attorney. *Id.* at 5–6. More importantly, Petitioner's work history established that despite living with SFN for over a decade, she has demonstrated her "superior cognitive abilities" through annual promotions, including reaching partner status by age thirty-five. *Id.* at 6. Respondent referenced Petitioner's self-reported accounts of performance impairment due to her SFN; however, he questioned why Petitioner would be able to perform in a "Big Law" environment after a decade hiatus, as opposed to now. *Id.* Instead, Respondent contended that these symptoms may have developed because "[P]etitioner is existing on five hours (or less) of sleep each night, raising three children (and likely helping to oversee their remote education at times during the COVID pandemic), all while working sixty-plus hours per week in a high-stress environment." *Id.* Petitioner's friend, S.C., also noted that Petitioner bills as much as 300 hours over her firm's strenuous requirement of 2,000 hours a year, and S.C. has encouraged Petitioner to seek work-life balance as she did. *Id.* at 6 n.2.

### B. Petitioner's Response

In response to Respondent's motion, Petitioner asserted that the motion was an attempt "to relitigate the entitlement hearing as part of the damages part of this case." Pet'r's Resp. at 1. Specifically, Petitioner argued that Respondent is recycling his previous argument that Petitioner's symptoms are not the result of her SFN, and therefore "there is no evidence that Petitioner's small fiber neuropathy is impairing her ability to perform the duties of her current job." *Id.* at 10–11. She continued that "Respondent, it seems, having failed to successfully convince the [C]ourt that Petitioner does not have [SFN], is now attempting to advance its previously rejected argument that Petitioner's symptoms, which she has consistently identified as only being present following her vaccine injury of August 23, 2011, are unrelated to her diagnosis of [SFN]." *Id.* at 15. Petitioner reiterated the opinions of her experts, who, during the entitlement and damages phases, attributed her chronic pain to her SFN and explained that said pain "necessarily leads to fatigue and cognitive decline." *See id.* at 15–16. Petitioner further noted the "sharp contrast" between Respondent's lay observations and his experts' opinions, and her experts' "peer-reviewed testing methods and rel[iance] on decades of experience in the fields of neurorehabilitation psychology, occupational rehabilitation, functional capacity analysis, and vocational analysis[.]" *Id.* at 20.

## V. Analysis

The Vaccine Act provides for recovery of "anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections[,]" where the injured party's "earning capacity is or has been impaired by reason of such person's vaccine-related injury[.]" §15(a)(3)(A). Compensation awarded for a petitioner's anticipated loss of earnings may not be based on speculation. *J.T. v. Sec'y of Health & Hum. Servs.*, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (indicating § 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation[]" and thus refusing to allow lost wages on a planned business venture that was too indefinite); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 131, 139 (2020) (citing *J.T.*, 2015 WL 5954352, at *7). Accordingly, it is not enough to substantiate such a request with *some* evidence if the submissions offered ultimately rely on speculated (if somewhat informed) "guesses" about what a claimant might have earned under optimal conditions. *See, e.g., Moreland v. Sec'y of Health & Hum. Servs.*, No. 18-1319V, 2022 WL 10469047 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying injured real estate agent's claim of

lost commissions; although petitioner substantiated her claim with evidence, she could not demonstrate her expectation of commissions or other real estate-related income was more than a reasoned hope).

The major point of contention for the parties in this damages phase is future lost wages. Petitioner has not requested compensation for past wage loss or indicated that her career trajectory suffered in any way because of her condition. In fact, in an effort to retain her employment with her law firm, Petitioner's managing partner agreed to allow Petitioner to maintain partner status with a 20% reduction in her scheduled hours. Pet'r's Ex. 152 ¶ 30. Petitioner took advantage of this opportunity during a trial period and even worked one month at 60% productivity, unrelated to her injury. *Id.* ¶ 33. However, even with this adjusted schedule, Petitioner reported that she "did not experience a significant improvement in her symptoms." *Id.* She has since determined that she does "not see a path forward to remain a partner," and her future loss wages request is based on the salary reduction she would endure in giving up that status. *See id.* ¶ 38. Petitioner has suffered from SFN during her entire career as a lawyer and tenure as an employee of her law firm. Symptoms notwithstanding, Petitioner has been able to excel in her career and advance within her firm over the past ten years. She met her occupational goals, was promoted at every opportunity, and even had the ability to engage in additional pro bono work. All these accomplishments came to pass without Petitioner's employer ever being made aware of her injuries, which are now, as alleged, disabling. For the entirety of Petitioner's career, her SFN has had no tangible impact on her work product. She was not denied trial or management opportunities. She received requested accommodations both before and after she disclosed her injury to her employer. She was not demoted or denied advancement openings. Now, following the resolution of her injury claim, she asserts that her inability to maintain an admittedly strenuous pace, in a stressful field known for burnout, at a high-stakes, international law firm, has become apparent during this damages phase and requires future compensation. I applaud Petitioner's work ethic and accomplishments. Furthermore, I do not doubt her sincerity in describing her inability to maintain her current work/life balance. However, I cannot agree with the contention that her SFN is to blame.

Petitioner, her lay witnesses, and her experts have explained why Petitioner would be unable to continue her current work pace. However, their opinions also provide some of the most persuasive evidence supporting Respondent's argument. For example, Petitioner's experts conducted an interview with Petitioner's friend, S.C. Pet'r's Ex. 99 at 24. S.C., who does not appear to suffer from SFN, described Petitioner's schedule as unreasonable, particularly considering her additional nonbillable hours and familial obligations. *Id.* S.C. noted that she left the stressful world of corporate litigation to do more meaningful things, including taking care of her children and spending time with her husband. *Id.* at 25. She has encouraged Petitioner to do the same. *Id.* at 24. This perspective is a clear example of a common career path: individuals who are successful corporate litigators leave the fast-paced, stressful nature of that work to improve their overall lifestyle, unrelated to any physical disability. It is clear that Petitioner was able to do the work for over a decade despite her diagnosis. It is not clear that Petitioner is unable to continue because of her continued symptoms. Anecdotal evidence, such as that presented by S.C., persuasively promotes the premise that Petitioner's need for a reduction in her work schedule is a result of a decade's worth of working in a demanding field with other familial and personal obligations.

Petitioner's treating physicians also provided insight into Petitioner's need to adjust her work-life balance, based on the clinical presentation of her symptoms over the years. Neurologist Dr. Marquez de Leon diagnosed her with mild autonomic neuropathy in 2011, but as of 2012, Petitioner has had normal physical exams with some coldness, numbness, and occasional burning on the right side. Pet'r's Ex. 9 at 47; Pet'r's Ex. 7 at 18; Pet'r's Ex. 1 at 8; Pet'r's Ex. 2 at 16. Dr. Barboi noted that Petitioner's SFN has been stable since 2012, which is one year after her vaccination and eleven years ago from the present. *See* Pet'r's Ex. 160 ¶ 6. Since 2012, she has consistently complained of headaches, but it must be noted that Petitioner has suffered from migraine headaches dating back to a 2003 concussion. *See* Pet'r's Ex. 2 at 49–62. Further, Petitioner has not provided evidence that headache is a symptom identified to diagnose SFN or that is specifically treated as a symptom of SFN. Respondent's experts also noted that many of Petitioner's symptoms, including right eye pain and visual blurring, are not associated with SFN, but are more likely the effect of comorbidities. It is more likely that Petitioner's headaches are a symptom of her pre-existing occipital neuralgia. *Dorland's Medical Dictionary* also defines this condition as occipital headache due to its defining symptom. *Dorland's* at 1244. Petitioner has continued to complain of chronic headaches since 2012; however, she has not presented any evidence of treatment or medical follow-up related to that specific condition. Petitioner also consistently complained of vision blurriness and eye pain. The visual cortex[32] is also located in the occipital lobe, and it is likely that her neuralgia is also affecting her vision. *See Dorland's* at 416. Petitioner's routine follow-up appointments in 2018 and 2021 revealed that her neuropathy has remained stable. *See* Pet'r's Ex. 88 at 3, 45. During this time, she was able to continue her ascent to partner without notifying her employer of any issue.

In 2022, Petitioner complained to Dr. Barboi of a substantial increase of her symptoms, but there does not appear to be any physiological change or laboratory result to explain this exacerbation. *See* Pet'r's Ex. 160 ¶ 14. In addition to headache and eye pain, Petitioner noted that her current, primary symptoms are burning in her upper extremities, feet, and hip joints, and fatigue. Pet'r's Ex. 152 ¶ 2. Petitioner has consistently complained of these symptoms since her initial diagnosis over a decade ago. In response to her regular complaints, Dr. Barboi had, for years, cautioned Petitioner about the pace of her lifestyle and resulting fatigue. *See* Pet'r's Ex. 160 ¶¶ 10, 13. Those admonitions continued even within affidavit he prepared in 2023 for the damages phase of this case. *Id.* ¶ 16. Despite his recommendations, Petitioner continued with her ambitious work schedule for years without the need for disclosure to her employer or substantive accommodations. Petitioner's medical record does not provide preponderant evidence that her SFN symptoms have evolved to prevent her from working.

Petitioner's vocational experts, Drs. Deeker and Matheson, opined that Petitioner's MTAP "demonstrate[d] considerable and dependable degradation of her functional capabilities over the past [eleven] years." Pet'r's Ex. 89 at 39. They did not explain or point to any evidence illustrating that over time Petitioner's capabilities degraded or wore down. Petitioner detailed serious flares that were documented around, and attributed to, her pregnancies. *See, e.g.*, Pet'r's Ex. 88 at 54. However, during each of her pregnancies, Petitioner took extended paid, maternal leave from her law firm. Pet'r's Ex. 152 ¶ 14. She has not alleged that her symptoms permanently worsened after any of her pregnancies. Conversely, she positively noted that she did not have

---

[32] The visual cortex is "the area of the occipital lobe of the cerebral cortex concerned with vision." *Dorland's* at 416.

additional work-related stress during those times. Petitioner described later complex and protracted trials that caused her additional stress. *See id.* ¶ 15. Indeed, it is hard to imagine that "a massive federal multidistrict litigation" would not have a stressful effect on anyone. At the conclusion of one such trial she recounted, Petitioner did not alter her schedule and was able to continue her advancement within her law firm. *See id.* ¶ 16. She does not present a persuasive argument to explain why, after living with these symptoms and thriving in her career such that she makes no request for past wage lost, she is now unable to continue due to her condition. Petitioner has not presented preponderant evidence that her condition has affected her career trajectory. *See c.f. Brown v. Sec'y of Health & Hum. Servs.*, No. 00-182V, 2005 WL 2659073, at *6 (Fed. Cl. Sept. 21, 2005) ("All of the evidence indicates that this vaccine-related injury derailed the meteoric rise of a talented young executive who was being groomed for upper management.").

Drs. Deeker and Matheson strongly asserted that the chronic pain that Petitioner experiences "interferes with attentional capacity, processing speed and psychomotor speed, and fatigue diminishes the ability to sustain attention and concentration, and also slows reaction time and processing speed [ ]." Pet'r's Ex. 124 at 7. They related these hinderances directly to Petitioner's current job responsibilities and performance to argue that she is unable to continue to do perform her responsibilities at current levels. *Id.* at 7, 10. They concluded that she has only been so successful thus far because of "extraordinary effort that cannot be sustained indefinitely." *Id.* at 10. Based on Petitioner's reporting, however, she has been struggling with cognitive issues due to pain for the totality of her condition. In fact, Petitioner recounted that when she took the [state] bar exam, she "requested and received accommodations to manage her lower levels of cognitive efficiency and productivity." Pet'r's Ex. 99 at 2. It does not appear that she requested any such accommodation again, while working for her law firm, even during particularly stressful times, until 2023, more than ten years later. Despite that, she was able to excel. Furthermore, Drs. Deeker and Matheson acknowledged that "most of [Petitioner's] functional limitations do not directly impact her work tasks." *Id.* at 3.

Petitioner provided medical literature that identifies chronic pain and fatigue as symptoms that are commonly associated with SFN patients. However, one of the articles was specifically studying the relationship between SFN and fibromyalgia, a disease characterized by widespread pain. *See* Pet'r's Ex. 101 at 1. The authors of the second article were unable to identify whether pain is a primary or secondary symptom. *See* Pet'r's Ex. 102 at 6. Petitioner reported current pain, but she does not undergo any sort of pain management and only uses over-the-counter medications "a few times a month." Pet'r's Ex. 89 at 24. In addition to pain, Petitioner repeatedly complained of fatigue from longer work hours. For context, she added that she has become a parent (three times over) and a law firm partner with accompanying additional responsibilities. Drs. Deeker and Matheson also pointed out Petitioner's "responsibilities as a wife, mother, and family household contributor[.]" Pet'r's Ex. 124 at 20. Petitioner noted that she had hired a nanny, housekeeper, landscaper, and chef to assist with family care. *Id.* These types of additional private support are commonly utilized by successful lawyers (and other professionals) who are financially able but time constrained due to job demands. Indeed, Petitioner does not indicate that she would not have this help but for her condition. Petitioner was asked what her goals were. She responded that she wanted a more balanced lifestyle, spend quality time with her children, pursue a hobby, and read a book. Pet'r's Ex. 89 at 25. These goals are common for many thirty-something working moms (and dads) practicing in demanding, professional fields, including S.C. Petitioner included

in her goals that she wishes to live with less pain, but that is more appropriately considered pursuant to a pain and suffering award.

Petitioner presented a significant amount of economic evidence in support of a damages award for future wage loss, and I have reviewed all of that evidence. However, that evidence is secondary to a determination that future wage loss is appropriate. I do not find that to be the case here. The evidence establishes by preponderance evidence that Petitioner's career has not been hindered in any way. Furthermore, Petitioner's employers have indicated a willingness to work with her to design a schedule that allows her to keep her current status. Notwithstanding her professional success, Petitioner's work-life balance has been described by her own witness as unreasonable, so much so that the witness, herself a corporate lawyer, changed careers for a better quality of life.

There does not appear to be any medical evidence, whether from appointment records or treaters, or from Petitioner's own account, that she is now suffering from worsening symptoms that are indicative of progressing SFN. In fact, her condition has been stable for over a decade. Petitioner is requesting a future wage loss award because her condition, in essence, causes her fatigue and pain. The evidence that Petitioner has submitted illustrates a lifestyle that would cause fatigue regardless of health. Of note is Petitioner's report of four to five hours of sleep per night due to a full-time, high-powered job, a husband, and three young children. Petitioner also reported pain that is largely caused by right eye pain and migraine headaches likely not caused by SFN. It would be impossible to pay out the possible future salaries of every petitioner who asserted an inability to work due to pain without tangible evidence of said inability. Petitioner has not needed to disclose her condition to her employer until recently. She is not applying for disability and is basing her request on another legal position that she does not currently have. I do not find that Petitioner has presented preponderant evidence that a future wage loss award is appropriate in this case. Petitioner has not established it more likely than not that her earning capacity is impaired because of her vaccine-related injury. *See* §15(a)(3)(A).

## VI.   Conclusion

For the reasons discussed above and based on consideration of the record as a whole, I do not find that an award for future wage loss is appropriate in this case. Respondent's motion is therefore **GRANTED and the claim for future wage loss is DENIED**. The parties are directed to attempt resolution of remaining pain and suffering damages, pursuant to Respondent's assertion that remaining damages could be negotiated by the parties following my decision on wage loss. Accordingly, Petitioner shall file a status report indicating the status of these negotiations within thirty days of the issuance of this Order.

IT IS SO ORDERED.

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master